FILED

DEC 0 4 2012

U.S. DISTRICT COURT
MARTINSBURG, WV 25401

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
## (Martinsburg Division)

**VERONICA DARIA,**

        *Plaintiff,*

**v.**　　　　　　　　　　　　　　　　　　　Civil Action No.: 3:12cv \_52\_

**DR. CHARLES H. POLK,**
**MOUNTAIN STATE UNIVERSITY, INC.,**
**MOUNTAIN STATE UNIVERSITY BUILDING COMPANY,**
**MOUNTAIN STATE UNIVERSITY FOUNDATION, INC.,**
**MOUNTAIN STATE UNIVERSITY ENDOWMENT FUND, INC.,**

        *Defendants.*

### PLAINTIFF'S ORIGINAL COMPLAINT

**TO THE HONORABLE UNITED STATES DISTRICT COURT JUDGE:**

Plaintiff, Veronica Daria (hereafter referred to as "Plaintiff") a former Mountain State University (hereinafter referred to as "MSU") student was enrolled in the LPN-BSN cohort nursing program, which was a two-part 18 month program consisting of (a) completion of pre-requisite classes, and (b) completion of nursing classes, by and through her legal counsel Sherman L. Lambert, Sr., Esquire, and SHERMAN L. LAMBERT, SR.., P.L.L.C., files her complaint against defendants in this action and allege as follows:

### JURISDICTION AND VENUE

1.　　Jurisdiction against the defendants' is conferred upon this Court by 28 U.S.C. §1331 (federal question) and 28 U.S.C §1332 (diversity of citizenship), 18 U.S.C. § 1341 (frauds and swindles) and §1343 (fraud by wire).

2.　　The Court further has supplemental jurisdiction over the subject matter of the state law causes of action pursuant to 28 U.S.C. § 1367 (a).

## PARTIES

### (Plaintiff)

3.      Plaintiff, VERONICA DARIA, was a student at MSU and dedicated her life to serving others and aspired to become a registered nurse.[1]

4.      At all times hereinafter mentioned, plaintiff was and still is a resident of Pikesville, Maryland.

### (Defendants)

5.      Defendant DR. CHARLES H. POLK (hereinafter referred to as "Defendant Polk") was the President of MSU from 1990 until 2012.

6.      Defendant MOUNTAIN STATE UNIVERSITY, INC., (hereinafter "MSU") is a private West Virginia Corporation, having its main office (campus) located at 410 Neville Street, Beckley, Raleigh County, West Virginia, is incorporated under the laws of the State of West Virginia, and is licensed to do business in the State of West Virginia.

7.      Defendant MSU taught students throughout West Virginia, including, Martinsburg, Berkeley County, West Virginia; that MSU utilized on-line technology to provide courses, as well as providing traditional courses in classrooms; that MSU conducted classes in Martinsburg, Berkeley County, both on-line and in person; and MSU recruited students in Martinsburg, Berkeley County, West Virginia.

8.      Defendant MOUNTAIN STATE UNIVERSITY BUILDING COMPANY, is a private West Virginia Non-Profit Corporation, and is affiliated with MSU, having its main office located in Beckley, Raleigh County, and is incorporated under the laws of the State of West Virginia, and is licensed to do business in the State of West Virginia.

---

[1] Nursing is a profession within the health care sector focused on the care of individuals, families, and communities so they may attain, maintain, or recover optimal health and quality of life. (Wikipedia Encyclopedia)

9.      Defendant MOUNTAIN STATE UNIVERSITY FOUNDATION, INC., is a private West Virginia Non-Profit Corporation, and is affiliated with MSU, having its main office located in Beckley, Raleigh County, and is incorporated under the laws of the State of West Virginia, and is licensed to do business in the State of West Virginia.

10.     Defendant MOUNTAIN STATE UNIVERSITY ENDOWMENT FUND, INC., is a private West Virginia Non-Profit Corporation, and is affiliated with MSU, having its main office located in Beckley, Raleigh County, and is incorporated under the laws of the State of West Virginia, and is licensed to do business in the State of West Virginia.

11.    Venue is proper in the Northern District of West Virginia, including Berkeley County, on grounds that the cause of actions arose in Berkeley County, and within the territorial borders of the Northern District, and the acts alleged herein occurred at MSU's Berkeley County campus, and through electronic wires and mail transmissions in Berkeley County, West Virginia.

## NATURE OF DEFENDANTS' OPERATION AND STATEMENT OF FACTS

12.    Defendants were engaged in a widespread criminal enterprise consisting of a pattern of racketeering activity and a conspiracy to engage in racketeering activity involving numerous racketeering acts during the past ten (10) calendar years.  The predicate acts alleged herein include mail fraud and wire fraud.  (*See,* 18 U.S.C. §§ 1341 and 1343, respectively.) These acts were not isolated events, but rather part of an overall conspiracy and pattern of racketeering activity.  Additionally, Plaintiff is entitled to relief for other causes of action including multiple violations of the West Virginia Consumer Credit Protection Act,[2] conspiracy, fraud, breach of contract, and other common law violations.

---

[2] §46A-6-101. Legislative declarations; statutory construction.

(1) The Legislature hereby declares that the purpose of this article is to complement the body of federal law governing unfair competition and unfair, deceptive and fraudulent acts or practices in order to protect the public and

13.    Former MSU President, Defendant Polk, was the leader of the MSU Enterprise and controlled the racketeering activity and deceptive practices with the MSU, which includes all Defendants and others.

## I. The History of Defendant MSU and Defendant Polk

14.    Founded in 1933 as a junior college, MSU was originally Beckley College.  In 1991, under the direction of Defendant Polk, [3] Beckley College was re-named to The College of West Virginia.  In 2001, The College of West Virginia was re-named to MSU.

15.     The name "MSU" is misleading to the public and clearly infers a relationship to the State of West Virginia.  However, MSU is not, nor has ever been, a state or public university.

16.    In 1998 the University of West Virginia Board of Governors, the predecessor to the West Virginia University and Marshall Boards of Governors, engaged in discussions with the College of West Virginia and Defendant Polk to develop a private-public partnership.  However, newspaper accounts specified that the College of West Virginia was amid an undisclosed federal investigation.

17.    Newspaper accounts further indicated that the partnership collapsed when Defendant Polk was unwilling to accept a reduced salary in the amount of $100,000.00.

18.    Under the direction of Defendant Polk, in 2001, the school re-named itself as MSU.

19.    MSU focused on enrollment growth and the freshman application acceptance rate was 100%, which was incredible. (*See, Exhibit B*).

20.    Nearly 90% of MSU's operating revenue came from student tuition and charges, which

---

foster fair and honest competition. It is the intent of the Legislature that, in construing this article, the courts be guided by the interpretation given by the federal courts to the various federal statutes dealing with the same or similar matters. To this end, this article shall be liberally construed so that its beneficial purposes may be served.

[3] Defendant Polk left his job as president of Daytona Beach Community College amid allegations (and a finding of probable cause by the Florida Commission on Ethics) that Polk had conducted unlawful personal real estate transactions with a company that contracted with the school. (*See, Exhibit A*)

were in the form of taxpayer subsidized grants, scholarships, and federal student loans.

21.    MSU characterizes its students as "consumers"[4] unlike other colleges and universities.

22.    MSU and the Defendants, (hereinafter collectively referred to as "the Enterprise") conspired and orchestrated a scheme to continue to generate money for the Enterprise by increasing student enrollment to generate maximum federal student loans and grant money, meanwhile withholding information regarding MSU's academic progress from accrediting and government agencies.

23.    According to the Chronicle of Higher Education, MSU's graduation rate of 2.5% for students seeking bachelor's degrees was the lowest rate of any private school in its analysis (*See, Exhibit C*)

24.    Today, MSU remains on" provisional" certification status with the U.S. Department of Education on grounds that it failed to demonstrated the ability to monitor the academic progress of students, which is in violation of the federal Satisfactory Academic Progress (hereinafter referred to as "SAP") requirements.  SAP requirements are a series of federal rules for colleges and universities to utilize so that the U.S. Department of Education[5] can evaluate the academic progress of students in order to determine whether to continue issuing financial aid to students at a given institution.

---

[4] §46A-6-102(2) - Definitions. "Consumer" means a natural person to whom a sale or lease is made in a consumer transaction and a "consumer transaction" means a sale or lease to a natural person or persons for a personal, family, household or agricultural purpose.

[5] The U.S. Department of Education does not accredit educational institutions and/or programs. However, the Secretary of Education is required by law to publish a list of nationally recognized accrediting agencies that the Secretary determines to be reliable authorities as to the quality of education or training provided by the institutions of higher education and the higher education programs they accredit. The U.S. Secretary of Education also recognizes State agencies for the approval of public postsecondary vocational education and nurse education. The goal of accreditation is to ensure that education provided by institutions of higher education meets acceptable levels of quality. Accrediting agencies, which are private educational associations of regional or national scope, develop evaluation criteria and conduct peer evaluations to assess whether or not those criteria are met. Institutions and/or programs that request an agency's evaluation and that meet an agency's criteria are then "accredited" by that agency

25.   On July 19, 2012, the U.S. Department of Education assigned MSU to "heightened cash" monitoring.

26.   In 2012, the West Virginia Higher Education Policy Commission (hereinafter referred to as "HEPC") conducted an investigation of MSU into the use of state grant and scholarship money found that MSU would procure state funds that were intended for disbursement to students and failed to distribute the funds to the students.

27.   A part of the HEPC investigation, MSU produced fabricated documents to HEPC, which inferred that funds had been disbursed to MSU students, when in fact the funds had not been distributed.  As a consequence, MSU was required to reimburse the State of West Virginia for those misappropriated funds, in violation of West Virginia State law.[6]

28.   Defendant Polk encouraged lying, dishonesty, wrongdoing, unethical conduct, immoral conduct, misleading representation, false promises, and deceptive practices among MSU faculty and staff, in order to acquire enormous financial wealth for himself.

29.   According to the Chronicle of Higher Education, Defendant Polk's salary for 2009 was approximately $1,843,746.00, as president of MSU.  This was approximately 3.5% of MSU's annual budget, which was the highest percentage received by a president from the annual budget of a private university in 2009. (*See, Exhibit C*)

30.   Defendant Polk co-authored two (2) books, they are entitled, "*Apex Thinking*" and "*What Leaders Believe*".  These books delineate his thoughts, opinions and judgment on "leadership" considerations.  Oddly, these books are the only books ever published by the "Mountain State University Press".

---

[6] Pursuant to W.V. Code § 5A-3-30, which provides in pertinent part, "it is a felony, punishable by up to five years in prison, to obtain any money, goods, or other property from the state or any political subdivision of that state under any contract by false pretense, token or representation, or by delivery of inferior commodities,  with intent to defraud."

31.   Numerous MSU students were required to purchase these books, despite concern

from faculty members who did not want to compel MSU students to purchase the books or

want to designate the books as required readings from the syllabus and teach from the books.

32.   *Apex Thinking* was used as a playbook in the execution of the ongoing racketeering on

the Plaintiff.  Defendant Polk, herein, describes what makes a good leader (emphasis added):

> "There are times when the alternatives for achieving goals and objectives are so
> limited that one must misuse power.  In issues of survival or non-survival, **sometimes the
> deliberate misuse of power becomes the only way to survive,** even though such misuse
> may involve unintentionally harming others. This tactic again requires the chief executive
> to answer that very important question:  How far am I willing to go in the use of my
> power in order to survive?
>
> The deliberate misuse of power is almost certain to involve the injury of another.
> One must be aware that the "bloodletting' that ensues in the misuse of power may
> ultimately catch up with him.  However when backed into a corner, and it seems survival
> is possible only through an extreme use of power; weigh the relative merits, pros, and
> cons. These situations always pose a dilemma. Any given course of action could result in
> a failure to survive, but taking no action whatsoever is almost certain to ensure one's
> downfall.
>
> **While power, per se is neither positive or negative, certain situations
> necessitate its deliberate negative application.**
>
> **It is an age old story:  everyone who reaches the top, sooner or later will find
> themselves challenged with their backs against the proverbial wall.  It is then that
> apex thinkers conclude their own survival is more important than the ethical or
> non-ethical use of power."** *Id* at 113-114)

> "At times, it may become necessary to take drastic measures in order to simply
> maintain a prominent position.  The situation may demand that to play the game
> effectively, one must use 'bad' to balance 'bad', if not necessarily to 'do unto others
> before they do unto you!"  **When an unfair situation threatens to arise, it might
> become necessary to counter by, theoretically, exercising unfairness first in order to
> survive.?** (*Id* at 31-32)

> "The topic of board relationships compels discussion of another controversial
> issue: when presenting information to a board, should a CEO manipulate it to such a
> degree that it is nearly false?  **There are times when it is essential to skew information
> so that is creates a desired impression. If that's lying then one may have to lie a
> 'little bit.'** Most Chief Executives think of this as 'creative outcome!'" (*Id* at 66)

Most do not begin their careers planning to exercises such control. Many powerful people, however, begin as children to cultivate the skills involved in directing and    controlling others.  No one succeeds without enjoying the exercise of power.  **One must gain some satisfaction in the control of others.** Those who don't enjoy amassing and using it have no reason to work to acquire power." (*Id* at 107)

"Depending upon the situation, rather than owing up to an error, a CEO might want to say, 'Well, it is not my fault. What went wrong happened because either a subordinate or a board member or someone else caused the problem.' More often than not, **the best scapegoat technique is to pass blame along to some abstract agency or organization.**  Those kinds of institutions can be more easily blamed in situations when it is awkward or impossible to refute the accusation." (*Id* at 95)

33.   Defendant Polk advocated instilling fear in subordinates:

Concomitant with the idea of popularity is another issue—that of being loved versus that of being feared. It is more important for a chief executive to be feared than loved. **Traditional ideology maintains that when fear can be instilled in subordinates, one can effectively control their behavior."** (*Id* at 39)

34.   Defendant Polk directed lavish spending of the illicit gains of the racketeering proceeds, including the of the construction of life size statue of "himself" at MSU, the purchase of two (2) jet airplanes that he employed for personal use, and the lavish salaries of other  participants in the racketeering conspiracy, including Defendant Polk's 2009 salary of $1,843,746.00.

35   Defendant Polk's actions in furthering the racketeering activity, directly and proximately caused Plaintiff's injuries.

36.   Furthermore, Defendant Polk directly benefited from Plaintiff's injuries.  In 2009, MSU paid Defendant Polk approximately $1,843,085.00 (3.5% of all university expenditures, by far the highest of any college president in the country.

37. From years 2008 to 2010, Defendant Polk received approximately $3,340,085.00, in compensation.  Defendant Polk also lived in a home, maintained, owned and operated by MSU and used MSU's two jet airplanes to fly on personal trips to his homes in Florida and North Carolina, and to Texas.

8

## II. Allegations Regarding Fraud and the Accreditation Process

38.   Plaintiff was accepted by MSU and chose the pathway for the LPN (Licensed Practical Nurse) to BSN (Bachelor of Science in Nursing) degree program.  This specific program was designed for holders of vocational nursing degrees who wanted to become eligible for licensure as a registered nurse.

39.   Plaintiff chose to matriculate to MSU because she desired a BSN degree, which is more prestigious and marketable, and would significantly expand her career options.

40.   The Enterprise recruited Plaintiff – at times relentlessly – to MSU's nursing program; MSU represented that she would earn a degree in a short period of time, pass her exams and secure lucrative jobs after graduation.  MSU advanced these claims despite their knowledge of the school's appalling graduation rate and that the likelihood of students being unable to graduate and take the nursing certification examination,, was non-existent.  According to the Chronicle of Higher Education, MSU's graduation rate of 2.5% for students seeking bachelor's degrees was the lowest graduation rate of any private school by its analysis. (*See, Attachment C*)

41.   Although MSU and the Defendants knew that the nursing program was in jeopardy of losing accreditation long before Plaintiff applied for admission, the Enterprise repeatedly and deliberately deceived Plaintiff, made false promises to Plaintiff, and intentionally withheld and concealed important information from the Plaintiff, under fraudulent pretenses, concerning (1) the requirements for completion of the cohort nursing program; (2) the accreditation status of the cohort nursing program; (3) the time that it would take to complete the nursing degree; (4) the likelihood of graduation; (5) whether Plaintiff would be able to graduate from the cohort nursing program; and (6)whether Plaintiff would be able to sit for the NCLEX-RN examination to

receive licensure after completion of the cohort program.

42.   Meanwhile, the Enterprise unconscionably advised and pressured Plaintiff to quit her job, or move to part time employment status,  and incur maximum student loan debt, which clearly resulted in financial gain for the Enterprise, and placed a financial burden upon the Plaintiff.

43.   Not only did the Enterprise continue to perpetuate a false academic culture and deliberately deceive the Plaintiff, the Enterprise, at the direction of Defendant Polk, created a culture of fear among faculty members and instructed them not to notify or advised  students of MSU's accreditation  problems.  In fact, one faculty member filed suit against MSU for being unlawfully terminated for informing MSU students about the schools accreditation problems.

44.   At the same time, MSU pursed a campaign of misinformation and falsehoods, documents confirm that MSU, in order to comply with Securities and Exchange Commission rule 15c2-12, [7] on multiple occasions, sent material event notices of the accreditation problems to investors who held MSU municipal bonds, but not to the Plaintiff.

45.   MSU is partly funded by municipal bonds including the series 2004 Raleigh County Municipal Bonds, and the Series 2004 City of Beckley Municipal Bonds.  After realizing the fact of not notifying bondholders of the accreditation issues may constitute securities violations,

----

[7] On May 26, 2010, the Securities and Exchange Commission (SEC) unanimously approved amendments to Rule 15c2-12 under the *Securities Exchange Act of 1934* relating to municipal securities disclosure.  The approved amendments were originally proposed in SEC Release No. 34-60332, and were largely approved as proposed.

The purpose of the rule as to deter fraud and manipulation in the municipal securities market by prohibiting the underwriting and subsequent recommendation of securities for which adequate information is not available.  The amendments prohibit a broker, dealer, or municipal securities dealer ("Participating Underwriter") from purchasing or selling municipal securities unless the Participating Underwriter has reasonably determined that an issuer of municipal securities or an obligated person has undertaken in a written agreement or contract for the benefit of holders of such securities to provide certain annual financial information and event notices to various information repositories; and prohibit a broker, dealer, or municipal securities dealer from recommending the purchase or sale of a municipal security unless it has procedures in place that provide reasonable assurance that it will receive promptly any event notices with respect to that security.

Municipal Bonds, and the Series 2004 City of Beckley Municipal Bonds.  After realizing the fact

of not notifying bondholders of the accreditation issues may constitute securities violations,

MSU, at the direction of Chief Financial Officer Michele Sarrett, sent a series of "Material Event

Notices" to bondholders.  MSU issued the notices on July 13, 2011 (explaining that there was a

Show-Cause order by the Higher Learning Commission), Dec. 9, 2011 (advising investors that

NLNAC dropped the MSU nursing program's accreditation), Feb. 3, 2012 (explaining that

President Polk had been fired), March 8, 2012 (explaining that the WVBRN had withdrawn

accreditation and that students not graduating by August 31 would not earn degrees from nursing

degrees from MSU), and April 16, 2012 (announcing that Richard E. Sours was appointed as the

interim president).

46.   On January 26, 2012 Moody's placed MSU's municipal bonds on a watch list for

possible downgrading and then downgraded these bonds from Baa stable to Baa negative.

47.   On July 11, 2012 Moody's further downgraded the bonds to B1.  Moody's indicated

that the bonds are not investment grad and are now "junk."

48.   At the time Plaintiff were recruited to the MSU cohort nursing program, MSU

represented to each of the Plaintiff that the School of Nursing's BSN programs were fully

accredited by both the National League for Nursing Accrediting Commission [8] (hereinafter

referred to as "NLNAC") and the West Virginia State Board of Examiners for Professional

Nurses (hereinafter referred to as "WVBRN").

---

[8] The National League for Nursing Accrediting Commission (NLNAC) is responsible for the specialized
accreditation of nursing education programs (Clinical Doctorate, Master's, Baccalaureate, Associate, Diploma, and
Practical programs).  The Commission has authority and accountability for carrying out the responsibilities inherent
in the application of standards and criteria, accreditation processes, and the affairs, management, policy-making, and
general administration of the NLNAC.  The NLNAC is nationally recognized as a specialized accrediting agency for
both post-secondary and higher degree programs in nursing education.

six (6) NLNAC accreditation standards.[9]

51.   By letter dated, July 28, 2008, the NLNAC identified specific areas that had to be improved by 2012, in order for MSU to be restored to full accreditation status.

52.   The July 28, 2008 letter cited the following deficiencies, to-wit: (1) not all full-time faculty were academically Qualified; (2) multiple faculty had teaching overloads; (3) full-time faculty were practicing outside of their areas of expertise; (4) part-time faculty were not evaluated based on their competence; (5) there was a lack of rationale for variations among paths leading to nursing degree; and (6) there was a lack of information about the program that was current, accurate, clear, and consistent.

53.   MSU and the Defendants failed to inform current or prospective students of the important fact that MSU's BSN cohort program had lost "full" accreditation, and continued to advertise the nursing cohort program as "fully" accredited, even after the NLNAC publicly withdrew accreditation.

54.   At all relevant times, MSU represented to the Plaintiff that MSU's School of Nursing was fully accredited by the West Virginia State Board of Examiners for Professional Nurses. However, the WVRBN were investigating the school of Nursing at MSU since 2004. As a result of the investigation and the school's failure to address the WVBRN's accreditation concerns, during WVBRN's March 2010 board of director's meeting, the WVBRN ordered MSU to halt admissions to its BABS program until WVBRN determined that MSU had taken a specific

---

[9] Accreditation standards and criteria for academic quality of postsecondary and higher degree programs in nursing The core values of accreditation emphasize learning, community, responsibility, integrity, value, quality, and continuous improvement through reflection and analysis. They require the nursing program to measure itself by exacting standards, honor high aspiration and achievement, and expect all persons associated with the program to recognize their responsibility to provide a supportive and humane environment in which people interact with each other in a spirit of cooperation, openness, and mutual respect.  Accreditation standards are agreed-upon rules to measure quantity, extent, value, and quality.  Criteria are statements that identify the variables that need to be examined in evaluation of a standard. NLNAC criteria are presented to peer reviewers as statements that represent an accurate description of an accredited program.

during WVBRN's March 2010 board of director's meeting, the WVBRN ordered MSU to halt

admissions to its BABS program until WVBRN determined that MSU had taken a specific

course of prescribed actions. However, students scheduled to begin the BABS program the

following term were not notified that the nursing program was suspended.

55.   MSU failed to timely notify Plaintiff of the suspension.

56.   On February 17, 2012, the WVBRN announced it was withdrawing accreditation from

MSU's School of Nursing, effective August 31, 2012.

57.   The Higher Learning Commission (hereinafter referred to as CHL"), the accrediting

agency that accredits schools in 19 States of the North Central region, including West Virginia,

issued a "Show-Cause Order" whereby MSU had the burden of demonstrating that it complied

with each of the "Criteria for Accreditation and related Core Components" in order to remain

accredited. However, MSU failed to show cause and the HLC subsequently withdrew MSU's

accreditation on July 10, 2012, noting that MSU "has not conducted itself with the integrity

expected of an accredited Institution, with regard to ensuring that its students have accurate and

timely information about the status of their academic programs." The HLC also found that MSU

(1) does not have the human or financial resources expected of an accredited institution; (2) had

not adequately planned for the future institutional challenges; (3) lacks effective governance and

administration to provide appropriate oversight over all levels of the institution and to take

appropriate action to ensure quality academic programs; and (4) lacks adequate learning support

and faculty oversight to assure an effective teaching and learning environment. The school-wide

accreditation that the HLC decided to revoke is effective on December 31, 2012.

58.   Eventually, rumors made it to the students at the School of Nursing regarding the

school's accreditation status. Plaintiff became concerned about whether they would be allowed

unless they have graduated from an institution accredited by its state board of nursing.

59.    The Enterprise repeatedly assured students through the nursing faculty, administration officials, and the Defendants, that the WVBRN and MSU were working to correct accreditation concerns, and that the current "provisional" accreditation status should not concern MSU students.  MSU repeatedly assured Plaintiff that she would still be able to graduate and sit for the licensing examination.

### III.    Allegations Regarding Plaintiff's Experience

60.    Plaintiff was enrolled in the nursing cohort program at MSU.

61.    Plaintiff completed nursing courses at MSU, and many of courses taken are not transferrable to other colleges.

62.    Plaintiff did not graduate with an accredited degree from MSU.

63.    Plaintiff will not be able to sit for the NCLEX-RN licensing examination.

64.    Plaintiff incurred substantial student loans expenses for nothing.

65.    Plaintiff is obligated to repay the student loans.

66.    Plaintiff suffered many atrocities associated with financial and family matters, while commuting to and from MSU to participate in the nursing cohort program.

67.    Plaintiff circumstances are unique and said injuries are not recoverable.

### FIRST CLAIM FOR RELIEF
### Violation of the Federal Racketeer Influenced and Corrupt Organizations Act
### (U.S.C. §§ 1962 (c) and 1962 (d)

68.    Plaintiff re-alleges paragraphs one through sixty-seven in this Complaint and incorporates them here as if set forth in full.

69.    This Claim for relief is asserted against all Defendants and arises under 18 U.S.C. §§ 1962 (c) and (d) of the Federal Racketeer Influenced and Corrupt Organizations Act

("RICO"), which provide:

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

70.   At all relevant times hereto each of the Defendants was a "person" within the meaning of 18 U.S.C. § 1961(3), as each of the Defendants as "capable of holding a legal or beneficial interest in property."

71.   At all relevant times the Defendants collectively constituted an "enterprise" within the meaning of 18 U.S.C. § 1961(4).  The Enterprise consisted of Defendant Polk, Defendant MSU, Defendant Mountain State University Building Company, Defendant Mountain State University Foundation, Inc., and Defendant Mountain State University Endowment Fund, Inc.

72.   Each of the Defendants has been associated with the Enterprise and each of the Defendants aided and abetted the Enterprise's actions and manage its affairs.  Each of the Defendants conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

73.   Defendants' multiple predicate acts of racketeering, as alleged above, include mail and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343.  The Defendants engaged in schemes to defraud potential and actual MSU nursing students through mail and wire fraud.

74.   The Enterprise engaged in schemes to defraud the Plaintiff through mail and wire fraud regarding the status of the accreditation of the MSU nursing cohort program.  For instance the MSU Enterprise repeatedly through wire and mail communications intentionally and deliberately

deceived and withheld information from the Plaintiff who was accepted and enrolled in the LPN-BSN program, regarding the status of the programs accreditation.  The MSU Enterprise, while knowing that the LPN-BSN program was suspended, withheld that information for an unreasonable time and failed to timely notify the Plaintiff.

75.   The Defendants engaged in schemes to defraud MSU nursing students through mail and wire fraud regarding the accreditation status of the nursing program.  At all times the Plaintiff applied to, was accepted and attended MSU, the MSU Enterprise was aware that the nursing program was unstable, and that the loss of accreditation was imminent.  Nonetheless, the MSU Enterprise continued to assure students that nursing program was stable and assured Plaintiff to continue taking out the maximum amount for student loans.  When Plaintiff called MSU, they heard a recording that said, "*Welcome to Mountain State, your fully accredited hometown university.*"  However, nobody returned Plaintiff's telephone calls.

76.   The MSU Enterprise knew the nursing program was unstable, but continued to channel federal student loan money into the coffers of Defendants bank accounts, meanwhile the nursing cohort program's accreditation was in the process of being suspended.

77.   The Defendants engaged in schemes to defraud potential and actual MSU nursing students through mail and wire fraud regarding the time that it would take to complete a nursing degree.  The MSU Enterprise assured students that they would be able to work fulltime and that they would be able to earn degrees in a very short period of time.  After students were enrolled in the nursing cohort program, MSU forced many of them to work part time instead of full time, and make them attend more semesters and courses than they were originally told.  All of this was part of the scheme to maintain and insure a revenue stream into the MSU Enterprise at any cost to the Plaintiff.

78.  The Defendants engaged in schemes to defraud potential and actual MSU nursing students through mail and wire fraud regarding the likelihood of graduation.  Although, the Defendants knew that the Plaintiff would not be able to graduate with an accredited degree if the accreditation was suspended, the MSU Enterprise represented to the Plaintiff through a series of false statements that even if the accreditation were suspended, that they would be able to graduate with a degree from an accredited institution.

79.  The Defendants engaged in schemes to defraud potential and actual MSU nursing students through mail and wire fraud regarding whether they would be able to sit for the NCLEX-RN examination.  Although, the Defendants knew that the Plaintiff would not be able to sit for the NCLEX-RN examination if accreditation was suspended.   Defendants represented to the Plaintiff through a series of false statements that even if the accreditation was suspended, the Plaintiff would still be able to sit for the licensing examination.

80.   Each of the schemes has involved concealment of information, deliberate deceptions, fraudulent misrepresentations, and omissions reasonably calculated to deceive nursing students. Defendants executed or attempted to execute such schemes through the use of the United States mail system and through transmissions by wire communications (e-mails, telephone calls, radio advertisements, television advertisements, and internet advertisement)  through interstate commerce.

81.   The MSU Enterprise through the use the United States Postal Service mail system and through telephone e-mail communications as well as radio, TV, and internet advertisements, perpetually assured Plaintiff that she would be able to get a degree from an accredited nursing school and sit for licensing examinations.  However, MSU knew that the accreditation was in jeopardy, and deceived Plaintiff regarding the correct posture of accreditation of nursing cohort

school and sit for licensing examinations.  However, MSU knew that the accreditation was in jeopardy, and deceived Plaintiff regarding the correct posture of accreditation of nursing cohort program, and when the WVBRN told MSU to stop admitting students to the LPN-BSN program, which was suspended at that time, MSU simply ignored the warning.

82.    Prior to 2012, each time Plaintiff questioned the accreditation status of the nursing cohort program, the Enterprise assured the Plaintiff that all was well and that they should plan to graduate and sit for their NCLEX-RN exam on schedule.

83.    These predicate acts form a "pattern" of racketeering activity.  They have been related in their common objectives of (1) soliciting unsuspecting students to enroll at MSU; (2) maximizing enrollment in the MSU nursing cohort program; (3) maximizing operating revenue from nursing students; (4) encouraging students to extract maximum student loan debt; (5) misleading nursing students, the public, accreditation agencies, and government agencies regarding operations as MSU; (6) defrauding the City of Beckley and the Raleigh County Building Commission; and (7) attempting to avoid responsibility for the foreseeable costs of the racketeering activity, by using revenues from the racketeering activity and pay excessive salaries to many of the Defendants.  These acts have had the same or similar purposes, results, participants, victims, methods of commission and have been consistently repeated.

84.    The Defendants' violations of 18 U.S.C. §§ 1962(c) and (d) have proximately and directly caused Plaintiff to incur significant injuries, including but not limited to (1) lost income; (2) excessive school expenses (tuition, fees, books, supplies, transportation, housing, background checks, immunizations, etc.) resulting in large student loan and credit card debt; (3) loss of potential earning capacity; (4) loss of professional and personal reputation; (5) starting over expenses - having to go back to school to retake their non-transferable credits; (6) impairment of

capacity to enjoy life; (7) mental anguish; (8) personal embarrassment; and (9) interference with personal relationships.  In absence of the Defendants' violation of 18 U.S.C. §§ 1962 (c) and (d), these costs and expenses would have been substantially reduced or non-existent.

85.   All the Defendants, as a result of their participation in the racketeering enterprise, received money from the illegal transactions of the enterprise.

86.   From 2008 to 2010, Defendant Polk received at least $3,340.085.00, the use of an MSU-owned home, and free airplane trips in a university-owned private jet.

87.   The Enterprise utilized Defendant organizations and racketeer participants, Defendant Mountain State University, Inc., Defendant Mountain State University Building Company, Defendant Mountain State University Foundation, Inc., and Defendant Mountain State University Endowment Fund, Inc., to funnel proceeds of the Enterprise and to other participants Associated with the Enterprise to conceal such illegal transactions from the Plaintiff and the public- at-large.

88.   Under the provisions of 18 U.S.C. § 1964 (c), the Plaintiff is entitled to bring this action and to recover herein treble damages, the costs of bringing this suit and reasonable attorneys' fees; and equitable relief, pursuant to 18 U.S.C. § 1964(a), in the form of injunctive relief, for the Enterprise to disgorgement all profits, and assets.

## SECOND CLAIM FOR RELIEF
### Consumer Violations

89.   Plaintiff re-alleges paragraphs one through eighty-eight in this Complaint and incorporates them here as if set forth in full.

90.   Defendant Polk's and MSU's false representations and withholdings of material information to the Plaintiff constitute multiple violations of the State of West Virginia's

1. Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services (§46A-6-102(7)(B));

2. Causing likelihood of confusion or of misunderstanding as to affliction, connection or association with or certification by another (§46-A-6-102(7)(C)).

3. Representing that goods or services have sponsorship approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have (§46-A-6-102(7)(E));

4. Advertising goods or services with intent not to sell them as advertised (§46-A-6-102(7)(I));

5. Engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding (§46-A-6-102(7)(M)); and,

6. The act, use or employment by any person or any deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any goods or services, whether or not any person has in fact been misled, deceived or damaged thereby (§46-A-6-102(7)(M)); and,

7. Advertising, printing, displaying, publishing, distributing or broadcasting, or causing to be advertised, printed, displayed, published, distributed or broadcast in any manner, any statement or representation with regard to the sale of goods or the extension of consumer credit, which is false, misleading or deceptive or which omits to state material information which is necessary to make the statements therein not false, misleading or deceptive (§46-A-6-102(7)(N))

91. Utilizing *Apex Thinking* as a playbook, Defendant Polk and MSU orchestrated a campaign to confuse, deceive, defraud, and misinform the Plaintiff by withholding information as to the certification of services (accreditation), and by deceiving the Plaintiff, both of which are in violation of W.Va. Code §§ 46-A-6-102(7)(B)-(C) and §§ 46-A-6-102(7)(E), (L).

92. Defendant Polk and MSU used deception, fraud, false pretenses, false promises, misrepresentations, and the concealment, suppression and omission of material facts as to (1) the status of accreditation of the nursing cohort program; (2) the requirements to complete to complete the LPN-BSN program; (3) the likelihood of graduation; (4) whether Plaintiff would be

status of accreditation of the nursing cohort program; (2) the requirements to complete to

complete the LPN-BSN program; (3) the likelihood of graduation; (4) whether Plaintiff would be

able to  graduate; and (5) and whether Plaintiff would be able to sit for NCLEX-RN examination.

93.   The Defendants violated W.Va. Code § 46-A-6-102(7)(M), in connection with the

sale of education services and the advertisement of the MSU Nursing school through aggressive

advertising and recruitment methods.  Although, the Plaintiff can prove that she did rely on the

misrepresentations and omissions, Defendants are still liable to the Plaintiff for injuries under

the statute, absent any showing of actual reliance.

94.   Defendant Polk and MSU through false and misleading advertising regarding the

accreditation status of the MSU School of Nursing induced the Plaintiff to enroll in the cohort

program, and to continue said enrollment in the MSU School of Nursing.

95.   As a result of said violations of West Virginia Code 46-A-6-101 through 110, the

Plaintiff was damaged as alleged above, and is entitled to all damages allowed by law

including attorney's fees.

### THIRD CLAIM FOR RELIEF
### Breach of Contract

96.    Plaintiff re-alleges paragraphs one through ninety-five in this Complaint and

incorporates them here as if set forth in full.

97.   The Plaintiff entered into a contract[10] with Defendant MSU, whereby MSU expressly

and impliedly promised that it would provide Plaintiff with a nursing education, with

accreditation by the NLNAC, and the WVBRN, and that upon graduation she would be eligible

to take the NCLEX-RN examination.

---

[10] The essential elements of a contract are (1) an acceptance in strict compliance with the terms of the offer; (2)
Legal Purpose/Objective; (3) Mutuality of Obligation – also known as the "meeting of the minds";
(4) Consideration; and  (5) Competent Parties.

98.   Plaintiff paid money to MSU which was the required consideration to bind the contract.

99.   Plaintiff relied upon Defendant MSU's promise to her detriment.

100.   The Defendants breached the contracts by failing to provide Plaintiff with a path to graduate with a degree from an accredited institution.

101.    As a result of the breach of contract, the Plaintiff was injured and MSU owes to the Plaintiff (1) lost income; (2) school expenses (tuition, fees, books, supplies, transportation, housing, background checks, immunizations, etc.) resulting in large student loan and credit card debts; (3) loss of potential earning capacity; (4) loss of professional reputation; (5)  incurred expenses in having to go back to school to retake her non-transferable credits; (6) impairment of capacity to enjoy life;  (7) mental anguish; (8) personal embarrassment; and (9) interference with personal relationships and all other damages available at law.

## FOURTH CLAIM FOR RELIEF
### Brach of Covenant of Good Faith and Fair Dealing

102.   Plaintiff re-alleges paragraphs one through one hundred and one in this Complaint and incorporates them here as if set forth in full.

103.   The Defendants had a duty to act in good faith in performing their obligations under the contract that existed between the Defendant MSU and the Plaintiff.

104.    By deliberately deceiving Plaintiff, misrepresenting facts, and withholding the material facts regarding the accreditation status of MSU, by and through its officers, directors, employees, and agents, violated the common law duty of good faith and fair dealing.

105.    Defendants violation of the covenant of good faith and fair dealing directly and proximately caused the Plaintiff to suffer (1) lost income; (2) school expenses (tuition,

professional reputation; (5) expenses in having to go back to school to retake their non-transferable credits; (6) impairment of capacity to enjoy life; (7) mental anguish; (8) personal embarrassment, and (9) interference with personal relationships. The Defendants owe the Plaintiff compensation for those injuries and all other damages available at law.

**FIFTH CLAIM FOR RELIEF**
**Fraud and Intentional Misrepresentation**

106.   Plaintiff re-alleges paragraphs one through one hundred five in this Complaint and incorporates them here as if set forth in full.

107.   As described under Count One above, Defendants, through a series of communications of material false information, induced Plaintiff to enroll in and continue enrolling in nursing classes at MSU so that the Defendants could cash in on federal student aid money. Furthermore, any time that the Plaintiff inquired with any of the Defendants, the Defendants concealed material information in order to induce the Plaintiff to enroll in and continue enrolling in nursing classes at MSU so that the Defendants could cash in on federal student aid money.

108.   The Defendants engaged in schemes to defraud the Plaintiff regarding the status of their applications. For instance the MSU Enterprise repeatedly through wire and mail communications intentionally lied to and withheld information from the aforementioned Plaintiff who were accepted and enrolled in the LPN-BSN program, regarding the status of their applications, acceptance, starting dates, and accreditation. The MSU Enterprise while knowing that the LPN-BSN program was to be suspended, withheld that information and then, more than six months after the closure of the LPN-BSN program notified the Plaintiff.

23

more than six months after the closure of the LPN-BSN program notified the Plaintiff.

109.    The Defendants engaged in schemes to defraud potential and actual MSU nursing students regarding what was needed to be accepted into the nursing program and what was required to graduate from the nursing program with a BSN.

110.    The Defendants engaged in schemes to defraud plaintiff and other LPN-BSN nursing students regarding the accreditation status of the nursing program.  At all times, the Plaintiff made application for admission and was accepted into the nursing cohort program; attended classes at MSU; and at that times relevant thereto, the MSU Enterprise was fully aware that the nursing program was unstable, and that  the loss of accreditation was imminent.

111.    The Defendants engaged in schemes to defraud potential and actual MSU nursing students regarding the time that it would take to complete a nursing degree.  The MSU Enterprise assured Plaintiff that they would be able to work full time and that they would be able to earn degrees in a very short period of time.  After the Plaintiff was then enrolled, MSU forced her to work part time, and make her attend more semesters and courses than originally advised.  All of this was part of the scheme to keep federal student loan revenue stream flowing into the MSU Enterprise at any cost.

112.    The Defendants engaged in schemes to defraud potential and actual MSU nursing students regarding the likelihood of graduation.  Although the Defendants knew that the Plaintiff would not be able to graduate with an accredited degree if the accreditation was suspended, the MSU Enterprise represented to the Plaintiff through a series of false statements that even if the accreditation was suspended that she would be able to graduate with a degree from an accredited institution.

examinations.  Although, the Defendants knew that the Plaintiff would not be able to sit for the

NCLEX-RN examination, if the accreditation was suspended, Defendants represented to the

Plaintiff through a series of false statements that even if the accreditation was suspended then the

Plaintiff would still be able to sit for licensing examinations.

114.   Each of those schemes has involved intentional concealment of information,

deception, fraudulent misrepresentations and omissions reasonably calculated to deceive

the Plaintiff.  The fraudulent schemes induced the Plaintiff to seek admission at MSU.

115.   Plaintiff relied, to her detriment, upon on the fraudulent misrepresentations and

fraudulent concealment of facts described above resulting in a multiple injuries. Defendants'

fraudulent activities directly and proximately caused the Plaintiff to suffer (1) lost income; (2)

school expenses (tuition, fees, books, supplies, transportation, housing, background checks,

immunizations, etc.) resulting in large student loan and credit card debts; (3) loss of  potential

earning capacity; (4) loss of professional reputation; (5) expenses in having to go back to school

to take their non- transferable credits; (6) impairment of capacity to enjoy life; (7) mental

anguish;  (8) personal embarrassment; and (9) interference with personal relationships.  Plaintiff

should be compensated for their injuries and all other damages available at law.

### SIXTH CLAIM FOR RELIEF
### Negligent Misrepresentation

116.   Plaintiff re-alleges paragraphs one through one hundred and fifteen in this

Complaint and incorporates them here as if set forth in full.

117.   The Defendants' conduct as set forth above was a negligent misrepresentation for

which the Defendants are liable to the Plaintiff for( 1) lost income; (2) school expenses, (tuition,

fees, books, supplies, transportation, housing, background checks, immunizations, etc.) resulting

in large student loan and credit card debts; (3) loss of potential earning capacity; (4) loss of

fees, books, supplies, transportation, housing, background checks, immunizations, etc.) resulting in large student loan and credit card debts; (3) loss of potential earning capacity; (4) loss of professional reputation; (4) expenses in having to go back to school to retake their non-transferable credits; (5) impairment of capacity to enjoy life; (6) mental anguish;  (7) personal embarrassment; (8) interference with personal relationships; and all other damages available at law.

## SEVENTH CLAIM FOR RELIEF
### Unconscionability

118.    Plaintiff re-alleges paragraphs one through one hundred seventeen in this Complaint and incorporates them here as if set forth in full.

119.    The Defendants' conduct in fraudulently inducing the Plaintiff into purchasing falsely marketed goods was unconscionable.

120.     As a result, the contract between Plaintiff and defendants, which required Plaintiff to purchase falsely marketed products is unconscionable.

121.    As a direct result of the Defendants' unconscionable conduct, Plaintiff suffered and will continue to suffer enormous injuries, to-wit: (1) lost income; (2) school expense (tuition, fees, books, supplies, transportation, housing, background checks, immunizations, etc.) resulting in large student loan and credit card debts; (3) loss of potential earning capacity; (4) loss of professional reputation; (4) expenses in having to go back to school to retake their non-transferable credits; (5) impairment of capacity to enjoy life; (6) mental anguish; (7) personal embarrassment; (8) interference with personal relationships;  and all other damages available at law.

## EIGHTH CLAIM FOR RELIEF
### Civil Conspiracy

122.    Plaintiff re-alleges paragraphs one through one hundred twenty-one through in this Complaint and incorporates them here as if set forth in full.

123.    The Defendants' actions and omissions as described herein constitute civil conspiracy.

124.    As a direct result of the Civil Conspiracy, the Plaintiff has suffered and will continue to suffer significant and substantial injuries, to- wit: (1) lost income; (2) school expenses (tuition, fees, books, supplies, transportation, housing, background checks, immunizations, etc.) resulting in large student loan and credit card debts; (3) loss of potential earning capacity; (4) loss of professional reputation; (4) expenses in having to go back to school to retake their non-transferable credits; (5) impairment of capacity to enjoy life; (6) mental anguish; (7) personal embarrassment; (8) interference with personal relationships;  and all other damages available at law.

## NINTH CLAIM FOR RELIEF
### Unjust Enrichment

125.    Plaintiff re-alleges paragraphs one through one hundred twenty-four through in this Complaint and incorporates them here as if set forth in full.

126.    Plaintiff made significant tuition payments to MSU, who distributed these payments to the other Defendants.  All Defendants had use of these proceeds.

127.    In return for these tuition payments, Plaintiff was assured of a nursing education from an accredited institution.

128.    Although Plaintiff did not receive the benefit of the bargain, the Defendants have taken the tuition payment proceeds.

129.    The use of these proceeds by the Defendants constitute an unjust enrichment of the Defendants at Plaintiff's expense.

130.    Equity demands that Plaintiff receive full restitution of tuition payments made to MSU.

## PRAYER

Because Defendants have engaged in the acts and practices described above, Defendants have violated the law, as alleged in this Complaint and unless restrained by this Honorable Court, Defendants will continue to violate the laws of the UNITED STATES OF AMERICA and the STATE OF WEST VIRGINIA and will cause injury, loss and damage to the general public.

**WHEREFORE,** Plaintiff demands judgment against Defendants, jointly and severally, as follows:

1.    Adjudging and decreeing that Defendants engaged in the conduct alleged herein, acting in concert and declaring that by such conduct, Defendants have violated the Racketeering Influenced and Corrupt Organizations Act.

2.    Enjoining and restraining Defendants and their officers, agents, servants and employees, and those in active concert or participation with them, from continuing to engage in or engaging in, racketeering, unfair and deceptive trade practices and other wrongful or unlawful conduct similar in purpose or effect to the wrongful or unlawful conduct described herein.

3.    Awarding damages and compensation in an amount not less than Five Million Dollars ($5,000,000.00) for each of the eight above-mentioned claims for relief.

4.    Ordering treble damages pursuant to 18 U.S.C. § 1964(c) and all of the relevant State statutory damages claims asserted herein.

5.      Awarding punitive damages for Defendants' willful indifference to the student victims of the Defendants' racketeering activities in order to deter such conduct in the future.

6.      Requiring Defendants to disgorge all unjust profits of the racketeering activity, which in equity and good conscience, and pursuant to 18 U.S.C. § 1964, Defendants should not be allowed to retain.

7.      Ordering pre and post-judgment interest and all costs, as provided by law.

8.      Awarding the Plaintiff their reasonable attorneys' fees and costs.

9.      Granting such other and further relief as the Court deems equitable, just, and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY**


**VERONICA DARIA, Plaintiff**
**By Counsel**




By:  "s/" Sherman L. Lambert, Sr., Esquire

Sherman L. Lambert, Sr., Esquire
SHERMAN L. LAMBERT, SR., P.L.L.C.
WVSB No.: 2129
P.O. Box 3200
Shepherdstown, WV 25443
(304) 263-3548
sherman@shermanlambertlaw.com